[598 NYS2d 245]

In the Matter of DARRYL KING, Respondent, v NEW YORK STATE DIVISION OF PAROLE, Appellant.

First Department, June 3, 1993

## APPEARANCES OF COUNSEL

*Charles C. Davis, Jr.,* of counsel, New York City *(Kathie A. Whipple* and *Susan A. Winston* with him on the brief; *Robert Abrams, Attorney-General,* attorney), for appellant.

*Myron Beldock* of counsel, New York City *(Daniel M. Kummer* with him on the brief; *Beldock Levine & Hoffman,* attorneys), for respondent.

*Lysaght, Lysaght & Kramer, P. C.,* Lake Success *(John J. Maquire* of counsel), *amicus curiae.*

## OPINION OF THE COURT

Per Curiam.

Petitioner has been a prison inmate for 22 years, following his conviction, in May 1971, upon a jury verdict, of murder, manslaughter in the second degree, attempted robbery in the first degree, assault in the first degree and possession of a dangerous weapon. The charges arose out of the shooting death of an off-duty police officer during the robbery of a fast food restaurant by two men on May 25, 1970. Petitioner was the only person arrested and tried for the crime. He was never indicted for intentional murder but was convicted under the felony murder statute (Penal Law § 125.25 [former (3)]), requiring an intention on the part of the defendant to commit the underlying felony, here robbery, but not requiring proof either that the defendant fired the weapon or that he had an intention to kill.

Under the statutory scheme then in place, if the court was satisfied that the "victim of the crime was a peace officer who was killed in the course of performing his official duties" (Penal Law former § 125.30 [1] [a] [i]) the matter could be referred to a jury, which would then determine whether to impose the death penalty (Penal Law former § 125.35; *see also, People v Fitzpatrick,* 32 NY2d 499, *cert denied* 414 US 1033, 1050, subsequently holding the imposition of the death penalty under these statutes unconstitutional). In this case, the matter was so referred and the second jury declined to impose the death penalty. Petitioner was thereupon sentenced to 25 years to life in prison. In 1987, after the United States Court

of Appeals for the Second Circuit found that petitioner's sentence was constitutionally invalid because the sentencing Judge had misunderstood the date petitioner would become eligible for parole *(King v Hoke,* 825 F2d 720), petitioner was resentenced.

At petitioner's resentencing, defense counsel attempted to raise the issue of whether petitioner should be sentenced based on the assumption that he had fired the fatal shot or whether the court should assume that it had been fired by the other, unapprehended, perpetrator. Clearly, while this factor would have no relevance on the issue of guilt or innocence of the crime of felony murder, it could well have an impact on sentence. At petitioner's trial, the prosecution had proceeded on the theory that petitioner was the shooter. Defense counsel claimed that ballistics evidence had since emerged demonstrating that petitioner could not have been the shooter and correctly pointed out that the Kings County District Attorney's office, in its brief to the Second Circuit, had since conceded that petitioner had not fired the shot. Despite this concession, the prosecutor at the resentencing asserted, without qualification, that petitioner was named as the shooter in the opening and summation at trial, and the resentencing Judge refused to even consider the issue. The court then sentenced petitioner to a term less than the maximum, i.e., 20 years to life, which meant that he would first become eligible for parole release on May 28, 1990.

Petitioner's first appearance before the Parole Board resulted in a denial of his application which was subsequently vacated based on the fact that Commissioner Gerald M. Burke had improperly served on both the original panel and the appellate panel. Petitioner was granted a new hearing, which took place in October 1991. At its close, his application was denied and he was rescheduled for a new appearance in two years, the longest deferment period available to the Board. However, because the two years were to run nunc pro tunc from the original denial, his next appearance, the one which is the basis of this appeal, occurred only four months after the previous denial. Prior to this appearance, petitioner submitted a request that the materials submitted in connection with his previous recent appearance in October 1991 be reviewed again in connection with this appearance.

These submissions establish that petitioner's record while in prison has been exemplary. Although entering prison at age 21 with a learning disability and a fifth-grade reading level,

he has since, through his use of programs available through the Department of Correctional Services, earned a Bachelor of Arts degree in sociology from the State University of New York, Empire State College. Petitioner has extensively participated and played a leadership role in Community Awareness Programs devoted to helping youths avoid trouble with the law, in self-help programs for physically challenged inmates and in veterans assistance programs. He has received letters of commendation from officials in all of the facilities in which he has been incarcerated and has participated in many invaluable programs, including inmate liaison and grievance committees, and has served as an officer of chapters of the NAACP, the Jaycees, the American Legion and religious organizations.

Other information before the October panel which also was submitted to the February 1992 panel established that, at the time of his arrest, petitioner was 21 years old and a heroin user but had had no prior contacts with the law. He was also a Vietnam era veteran, who, although he did not serve overseas, was disabled during his service by a foot injury. In the event of his release to parole supervision, petitioner would reside with his father at his home in the Bronx. In addition, petitioner submitted a letter establishing that, upon his release, he would have a job in the offices of a State Senator in Bronx County.

On February 14, 1992, petitioner appeared before a panel composed of Commissioners Gerald M. Burke, Maria Buchanan and Thomas W. Biddle. Among the comments of Commissioner Burke at the hearing were the following:

"You have served twenty-two years and you are [a] mature man. And you had good capacity when you started. I mean you were a bright guy. You had the capacity to really succeed educationally. And the programs were available. And you did it. And you've got now a BS in sociology and you are doing very well. As an inmate you have almost no peer. Although there are others like you.

"You have done very, very well. And no one can take that from you. No one should take that from you.

"On the other hand, we don't know what to do with murder in this society.

"You know, for thousands of years of recorded history if you killed somebody to the level of murder—you didn't do it accidentally—they killed you. It was like a simple process.

Unless you were the king; then you can do whatever you wanted anyway.

"So, only in the 19th century, one little piece of time from all reported history, do we have the idea about doing something about not killing them, and maybe we should have no executions for murder convictions, or we should have, as in your case, we should have two juries decide, one jury would decide whether he committed murder and then impanel another jury and that would decide whether he should be put to death or not. And that actually happened in your case * * *

"The second jury recommended against the death penalty. The first jury to consider that historically in New York State was a fellow by the name of Blaut and he hit the first jury and they said, 'Execute him.'

"Nevertheless, that is kind of immaterial, but it can cut both ways. People didn't think it would. But there was a whole movement around that time to certainly impede the ease at which the death penalty had previously been imposed. They wanted to make it a more difficult and studied process. And some benefited from that.

"And now here, 25 years or so later it's changing. More and more death penalties come up and more and more states are executing people. And they almost stopped doing it in this country. And the death penalty has declined all over the world, and yet it's beginning to perk back up again.

"Society itself has no answer for how much is enough. We don't have any answer. God doesn't tell us. He certainly didn't give the knowledge to know with certainty how much is enough for killing somebody. How much would be enough if you killed two? What about the age of the victims? If they were really young or old. I don't have that knowledge. And I don't want to try to sell myself to you or anybody that we have.

"And yet, in a few minutes, sometime today, this afternoon, this Panel is going to decide how much is enough with you. Do you understand that?

"[PETITIONER]: Yes.

"We are going to make a decision because we are in a position. That's our job to do. And we are going to do it.

"But I want to tell you, humbly, it's not written on stone. We don't know how much is enough. We don't have the answer.

"You were 21 years old and 10 months. An off-duty police-

man came into a restaurant. He was 23. Not too much older than you. His wife is waiting in the car. A stickup went down, apparently. He winds up dead and you're convicted of murder. Manslaughter. You're a young man. You served in the service. You didn't go to Vietnam because your brother was there * * *

"They kept you in the States. Served a couple of years. You got discharged. As other people before you, you have become involved, you got involved dabbling in heroin, I guess * * *

"And came back out and was still dabbling in heroin, and you dabbled in it that day, right?

"[PETITIONER]: Yes.

"And then you stuck up this place with others, whatever, there were no other codefendants. They are all unapprehended or whatever; is that right?

"[PETITIONER]: Yes.

"And you are here and we got you, the policeman is dead. You were a young boy, Vietnam veteran who picked up an unfortunate habit. You spent the last 22 years taking advantage and using your capacity and doing the best you could and you've done lots of good things to the tune of—people, they recognized in you the accomplishments that you've made.

"I've seen this before. I was here with you and I read the same material. Actually, it was submitted—a repeat of what was submitted to the Trial Court or Sentence Court and then to us.

"But I see in here Congresswoman Shirley Chisholm and Senators Kennedy and Moynahan and Mel Miller and Ronald Reagan and Al D'Amato and Mayor Koch and Ben Ward and Mario Cuomo, you know, Cardinal O'Connor—you have a natural talent perhaps for writing and you correspond with all these people. And they write to you. But, I don't know. Miguel Servant, the probationary policeman, he doesn't write to anybody.

"And the issue is kind of narrow for us. The answer to that bizarre question, 'How much is enough?' to which I already indicated I have no real great answer, although we are not going to shirk our obligation as a panel to make that decision today.

"You propose a residence with, I guess, your father in the clay *[sic]* area in the Bronx?

"[PETITIONER]: Yes.

"You're not the same guy that you were when you were in the fast food restaurant, if it was a fast food restaurant * * *

"You're not the same guy now. Miguel Servant, he wouldn't be the same guy either; he'd be 22 years older.

"Any society, and it's a dilemma that—you pose a dilemma to us. I want to share it. You are an intelligent, educated man.

"Any society that decides not to put to death twenty-two-year-old people who get convicted of murder is going to find— like life without parole, that is the current theory—it's good. I have no answer to that either.

"But any society that goes for that kind of a situation is going to wind up 20 years later with people of the capacity and who have taken enormous opportunities for growth and to get their Ph.D.'s and it's not going to answer the question what should they do 23 years ago.

"I don't think it's much better that we have people who get convicted of murder and then have the opportunity to get master's degrees, bachelors degrees, many skills. And yet you can't just use that opportunity and say that means they should get out. I don't have an answer for that.

"I'm trying to talk to you as frankly and openly as I can. I won't put you down.

"It's going to happen. If in the year 2000 we are going to have life without parole we will wind up in 2020 with a lot of people who killed people in the year 2000 who have now master's degrees and maybe we should furlough them so they can have children and families. And that poses a problem. People in death row suing the state because—their parents are suing the state because they say I'm being deprived of the right to be a grandparent. Because he can't have conjugal visits in the State of California because he's serving life without parole—I don't have those answers to those philosophical or metaphysical questions. I don't know. But here we do know, this panel. We are going to make a decision about you in a couple of minutes. A heavy one. I don't know what we are going to do."

Immediately after the hearing, apparently without any discussion whatsoever among the Commissioners, Commissioner Burke pronounced petitioner's application denied and set the maximum two-year date for his next appearance before the Board. He then entered the following decision:

"Parole again denied, due to nature, circumstances and

seriousness of the present offense: murder I, manslaughter II, and assault I. Subject, who has no prior convictions, was convicted of shooting a 23 year old off duty probationary policeman to death during a restaurant stick-up, twenty-two years ago this May. Subject had been abusing heroin at the time. Subject has effected an excellent institutional adjustment, including B.A. degree in sociology. There are many letters of support for subject's release. Subject was 21 years and 10 months old when instantly involved, and he has used the capacity he had at that time to take full advantage of the program opportunities available to him over the last 22 years, to his great credit. The 23-year-old policeman's opportunities for further participation and growth ended when he entered the restaurant to purchase food for himself and his wife, who waited outside in the car. Mr. King is a well spoken, thoughtful, intelligent man, but release at this time would promote disrespect for the law and depreciate [sic] the seriousness of this offense."

Petitioner's administrative appeal from this determination was denied and he brought this proceeding pursuant to CPLR article 78 seeking to set aside the decision of the Board. The IAS Court granted the petition on the ground that the decision to deny parole was irrational, and respondent appeals. The immediate parole of petitioner directed by the IAS Court has been stayed pursuant to the automatic stay provisions of CPLR 5519 (a).

Since we find that the decision of the Parole Board was based on a fundamental misunderstanding of its role and its power, and was not in accord with statutory requirements, we agree that the determination made by it may not stand.

The Parole Board performs a very significant function in determining the length of time which an inmate will spend in prison and it is entitled to exercise substantial discretion within its sphere (Penal Law § 70.40; Executive Law § 259-i [5]). However, that discretion must be exercised under the standards laid down in the Executive Law, which provides: "Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law" (Executive Law § 259-i [2] [c]).

The statute specifically delineates the type of information which the Board must take into account in making a decision as to whether these general criteria have been met: "(i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interpersonal relationships with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the federal government * * * and (v) the written statement of the crime victim or the victim's representative, where the crime victim is deceased or is mentally or physically incapacitated." (Executive Law § 259-i [2] [c].)

Additionally, if the court, as here, set the minimum period of imprisonment, the Board must also take into account: "(i)the seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court, the district attorney, the attorney for the inmate, the pre-sentence probation report as well as consideration of any mitigating and aggravating factors, and activities following arrest and prior to confinement; and (ii) prior criminal record, including the nature and pattern of offenses, adjustment to any previous probation or parole supervision and institutional confinement" (Executive Law § 259-i [1] [a]; [2] [c]).

It is not necessary that the Board's decision specifically refer to each and every one of these factors *(Matter of Davis v New York State Div. of Parole,* 114 AD2d 412; *People ex rel. Haderxhanji v New York State Bd. of Parole,* 97 AD2d 368, 369), or that the Board give each of them equal weight *(see, People ex rel. Herbert v New York State Bd. of Parole,* 97 AD2d 128, 133). However, while the courts remain reluctant to second-guess the decisions of the Board, it is unquestionably the duty of the Board to give fair consideration to each of the applicable statutory factors as to every person who comes before it, and where the record convincingly demonstrates that the Board did in fact fail to consider the proper standards, the courts must intervene *(supra).*

In this case, the record clearly reveals that the denial of petitioner's application was a result of the Board's failure to weigh all of the relevant considerations and there is a strong indication that the denial of petitioner's application was a

foregone conclusion. First, Commissioner Burke's extensive remarks at the hearing demonstrate that the Board was proceeding on the assumption that its primary duty was to determine, in the abstract, the appropriate penalty for murder in today's society. Indeed, Commissioner Burke's remarks made quite clear his belief that his own personal attitudes toward the propriety of punishing murder with the death penalty or with life imprisonment without the possibility of parole had some relevance to the question of how long petitioner should spend in prison. It is, in fact, difficult to avoid the inference that Commissioner Burke felt some regret that petitioner had not been executed, thereby eliminating the dilemma caused by his rehabilitation, and that he considered petitioner's rehabilitation to be a dilemma for the very reason that he believed that petitioner should not be eligible for parole. Since neither the death penalty nor life imprisonment without the possibility of parole are part of the law of this State, they should clearly not have entered into the Board's consideration.

The establishment of penal policy is not the role of the Parole Board or of any other administrative agency and these remarks reveal a fundamental misunderstanding of the limitations of administrative power. The torturous and difficult decisions involved in determining the appropriate penalty to be imposed for the commission of a particular crime is fundamentally a function which belongs in the hands of elected officials to be performed in open and considered debate. It is the province of the legislative process, except insofar as the Legislature has entrusted, within certain parameters, the imposition of individual sentences to the judiciary. The due operation of those processes to punish petitioner with a sentence of 20 years to life. The role of the Parole Board is not to resentence petitioner according to the personal opinions of its members as to the appropriate penalty for murder, but to determine whether, as of this moment, given all the relevant statutory factors, he should be released. In that regard, the statute expressly mandates that the prisoner's educational and other achievements affirmatively be taken into consideration in determining whether he meets the general criteria relevant to parole release under section 259-i (2) (c). The Commissioner's deprecation of the availability of such programs, at all, to one convicted of murder is in direct conflict with the statutory directive.

Not only do the comments of Commissioner Burke demon-

strate a reliance by the Board on matters not within its purview, but the record also reveals a failure on the Board's part to consider and fairly weigh all of the information available to them concerning petitioner that was relevant under the statute, which clearly demonstrates his extraordinary rehabilitative achievements and would appear to strongly militate in favor of granting parole. However, the only statutory criterion to which Commissioner Burke referred in stating the Board's determination to deny the application was its finding that petitioner's release would so depreciate the seriousness of his crime as to undermine respect for law by reason of the fact that the victim of the crime was a police officer. The Legislature, however, has not defined "seriousness of [the] crime" in terms of specific categories of either crimes or victims and it is apparent that in order to preclude the granting of parole exclusively on this ground there must have been some significantly aggravating or egregious circumstances surrounding the commission of the particular crime *(see, People ex rel. Thomas v Superintendent,* 124 AD2d 848, 849 [parole properly denied due to " 'extraordinarily serious and bizarre nature of the present offenses' "]). Certainly every murder conviction is inherently a matter of the utmost seriousness since it reflects the unjustifiable taking and tragic loss of a human life. Since, however, the Legislature has determined that a murder conviction per se should not preclude parole, there must be a showing of some aggravating circumstances beyond the inherent seriousness of the crime itself.

Here, the Board did not completely fail to attempt to explain why it felt that the seriousness of this murder conviction should preclude parole, but the only specific factor which it took into account in making that determination was the fact that it resulted in the death of a police officer. No attempt was made to examine the evidence at trial, and Commissioner Burke's remarks reveal that he was not particularly familiar with the facts and, apparently, did not even know how many perpetrators were involved in the crime. Nor was there any apparent awareness on the Board's part that the felony murder statute under which the jury found petitioner guilty did not require proof that he fired his gun or intended to kill the officer or that he was aware that the officer, who was in plain clothes and who, apparently, never announced his identity, was, in fact, a police officer. That the Board did not consider any facts surrounding the crime other than that the victim was a police officer is emphasized by reference to the hearing

record which indicates that, following the hearing, the Board had no discussion whatsoever before Commissioner Burke immediately pronounced the application denied. Additionally, while mention was made in the Board's decision of other factors relevant to petitioner's release, these factors, all of which weighed in favor of petitioner's application, were mentioned only to dismiss them in light of the fact that a police officer had been killed. For the Board to simply decide that any case which involves the death of a police officer, regardless of all of the other circumstances surrounding the crime, automatically necessitates the denial of parole is a breach of the obligation legislatively imposed upon it to render a qualitative judgment based upon a review of all the relevant factors.

In support of his position that the Board improperly chose to ignore any other factors relevant to its decision, petitioner offered, as evidence, an article in the New York Times referring to certain remarks made by respondent's Chairman, Raul Russi, two weeks before petitioner's hearing. That article includes the following: "Mr. Russi, himself a former Buffalo police officer who was shot on duty, said he agreed that people convicted of killing police officers should not get parole. But as long as state laws allowed parole, the Board would have to hold hearings. He added that since he has headed the State Division of Parole, no killers of police officers have been released" (New York Times, Feb. 3, 1992, at B6).

On this appeal, respondent's denial that these remarks were made is predicated upon its general denials in the answer to the petition and there is no submission indicating that Mr. Russi's remarks were misrepresented. The acceptance of the newspaper article by the trial court as evidence that the remarks were made was not improper, although we find that it would be inappropriate to consider it as evidence of the truth of the matter asserted, i.e., that such a policy actually has been instituted. The very making of such remarks, however, in and of itself, would at the very least raise concerns as to whether an atmosphere prejudicial to the fair consideration of petitioner's application was created.

For all of these reasons, we find that the decision of the Board was fatally tainted by its abdication of its responsibility to fairly consider all relevant factors and that, as a result, its determination to deny petitioner's application for parole release must be set aside. While we find it difficult to believe that petitioner would be denied parole after a hearing at

which the statutory factors are fairly and properly applied, the Parole Board should have the opportunity to make that determination using the appropriate standard. Accordingly, this matter is forthwith remanded to respondent and respondent is directed to provide petitioner with a de novo hearing, before a different panel, which shall consider all of the statutory criteria and all of the available information relevant to whether petitioner should be granted parole. The hearing is to be held within 60 days of the date of this order and a decision thereon to be made within 30 days of the hearing.

Accordingly, the order and judgment (one paper), Supreme Court, New York County (Bruce McM. Wright, J.), entered January 12, 1993, which granted the petition brought pursuant to article 78, denied respondent's cross motion to deny the petition and dismiss the proceeding, annulled the determinations of respondent made on September 3, 1992 and September 14, 1992, and ordered respondent to release petitioner to parole supervision is unanimously modified, on the law, to reverse that portion of the order requiring respondent to release petitioner to parole supervision, to remand the matter to respondent to hold, within 60 days of the issuance of this order, a de novo hearing before a different panel concerning the matter of petitioner's release to parole supervision, with a decision on such matter to be made within 30 days of the hearing, and otherwise affirmed, without costs.

SULLIVAN, J. P., CARRO, ELLERIN and WALLACH, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered January 12, 1993, unanimously modified, on the law, to reverse that portion of the order requiring respondent to release petitioner to parole supervision, to remand the matter to respondent to hold, within 60 days of the issuance of this Court's order, a de novo hearing before a different panel concerning the matter of petitioner's release to parole supervision, with a decision on such matter to be made within 30 days of the hearing, and otherwise affirmed, without costs.