■ In the Matter of KIM THOMAS, Respondent, v NEW YORK STATE DIVISION OF PAROLE et al., Appellants. [729 NYS2d 160] —In a proceeding pursuant to CPLR article 78 to review a determination of the New York State Division of Parole, dated February 16, 1999, which, after a hearing, denied the petitioner's request that she be released on parole, the appeal is from an order of the Supreme Court, Westchester County (Lange, J.), entered May 31, 2000, which granted the petition to the extent of annulling the determination and remitting the matter to the New York State Division of Parole for a de novo hearing.

Ordered that on the Court's own motion, the notice of appeal

is treated as an application for leave to appeal, and leave to appeal is granted (see, CPLR 5701 [c]); and it is further,

Ordered that the order is reversed, on the law, without costs or disbursements, the petition is denied, and the proceeding is dismissed on the merits.

A determination by a parole board whether or not to grant parole is discretionary, and if made in accordance with the relevant statutory factors, is not subject to judicial review absent "a showing of irrationality bordering on impropriety" (Matter of Russo v New York State Bd. of Parole, 50 NY2d 69, 77; see also, Matter of Silmon v Travis, 95 NY2d 470; Matter of Briguglio v Board of Parole, 24 NY2d 21; Matter of Heitman v New York State Bd. of Parole, 214 AD2d 673; Correction Law § 105; Executive Law § 259-i). The determination properly considered all relevant statutory factors, and there was no "showing of irrationality bordering on impropriety" (Matter of Russo v New York State Bd. of Parole, supra, at 77). O'Brien, J. P., Santucci and Smith, JJ., concur.

S. Miller, J., dissents and votes to affirm the order, with the following memorandum: I do not agree with my colleagues that the determination of the Division of Parole denying the petitioner's application for parole should be upheld. Rather, as will be detailed herein, this case is of the rare variety in which the decision denying parole is irrational and improper and should be set aside.

I

On February 20, 1980, the petitioner, then 15 years old, and her then 16-year-old friend, Charlene Burnett, decided to "cut" school. At some point on that fateful day, they met the victim, a 71-year-old woman, in a laundromat. The girls engaged the victim in conversation and feigned friendship to gain entrance into her apartment, which they then planned to burglarize.

Once inside, as the petitioner distracted the victim, Burnett slipped into other rooms and stole items of the victim's property. When Burnett rejoined the petitioner and the victim, the victim noticed an envelope protruding from Burnett's pocket. Evidently realizing what was happening, the victim began to scream at the girls and threatened to call the police. Burnett pulled the telephone cord out of the wall and hit the victim in the face with a shoe. At that point, the petitioner fled the apartment. She last saw the victim "holding her head * * * but she was still * * * alive." Burnett remained in the apartment and tied the victim up. The victim ultimately died from a heart attack induced by fear and stress (see, People v Burnett, 205 AD2d 792).

The crime went unsolved for over 12 years. During that lengthy period the petitioner, who had no further entanglements with the law, gave birth to and cared for three children. However, in 1992, a fingerprint found at the crime scene was linked to Burnett, who implicated the petitioner. The petitioner pleaded guilty to murder in the second degree and was sentenced, as a juvenile offender, to a minimum sentence of five years to life imprisonment. Burnett was convicted after trial and received a sentence of nine years to life imprisonment. By December 1997 the petitioner had served her minimum sentence and became eligible for parole.

## IIA

The petitioner appeared before the Parole Board (hereinafter the Board) on three occasions relevant to this appeal. At a hearing held December 16, 1997, the petitioner denied that she was aware of Burnett's plan to burglarize the victim's apartment. She claimed that she was only there to "hang * * * out with [Burnett]." The petitioner explained that back then, she was a "follower" and "just wanted to fit in." The petitioner witnessed the confrontation and saw Burnett hit the victim with a shoe, but the victim was alive when she left the apartment. The petitioner stated that she was "sorry for going in" to the apartment. She pled guilty because she "felt a responsibility because [she] was present." If released, the petitioner planned to return to school or obtain training, and get a job. An Inmate Status Report noted, *inter alia*, that the petitioner had participated in various educational and vocational programs while in prison and had incurred no disciplinary infractions.

By decision dated December 22, 1997, the Board denied the petitioner parole. The Parole Board Appeals Unit affirmed the denial of parole.

The petitioner commenced this proceeding pursuant to CPLR article 78 to challenge the denial of her application for parole. By order entered January 26, 1999, the Supreme Court annulled the determination of the Board and remitted the matter for a de novo hearing. The Supreme Court noted that the then-15-year-old petitioner, although guilty of felony murder, did not cause the victim's death, had not been involved with the law either before the crime or in the more than 12 years she was free after the crime, and had incurred no disciplinary infractions while in prison. To the contrary, the Supreme Court noted, the petitioner had obtained a certificate of earned eligibility pursuant to Correction Law § 805, which *required*

that she be given parole unless it was determined that there was a reasonable probability that, if she were released, she would not live and remain at liberty without violating the law, and that her release would not be compatible with the welfare of society. The Supreme Court held that on the facts presented, the Parole Board's determination that this standard was met was "irrational bordering on impropriety." The Supreme Court annulled the determination and remitted the matter for a de novo hearing.

## IIB

At the de novo hearing held on February 16, 1999, the petitioner denied that she helped Burnett tie the victim up, and stated that she ran out of the apartment after Burnett hit the victim with a shoe and things "started getting out of hand." The petitioner testified that she was unaware that the victim had been tied up or had died until she was picked up for questioning in 1992, at which point she told the police everything she knew. While in prison, the petitioner earned a "pre-GED," took various trade courses, worked various jobs, and received a certificate of earned eligibility.

That very day, the Board denied the petitioner parole. The Board noted the seriousness of the crime, and found that the petitioner minimized her role and demonstrated "limited insight" into her criminality. By decision dated November 26, 1999, the Parole Board Appeals Unit affirmed the denial of parole.

## IIC

At a scheduled parole hearing on December 9, 1999, the petitioner admitted for the first time before the Board that she entered the victim's apartment with the intent to commit a burglary with Burnett, and that they agreed that she would distract the victim while Burnett stole items. Burnett planned the crime. When Burnett hit the victim with a shoe, the petitioner said "[D]on't do that, don't do that," then became frightened and fled.

The petitioner explained that she pleaded guilty to murder in the second degree, even though it carried a maximum sentence of life imprisonment, rather than go to trial, because it was Burnett's word against hers and because she was "wrong for going into that apartment." The petitioner was aware that Burnett had claimed that it was the petitioner who actually struck the victim. However, the petitioner denied the truth of Burnett's claim.

The petitioner discussed her work and education programs in prison, and her plans after she was released. She expressed a desire to return to school or get a job, and she earnestly wanted to resume being a good wife and mother to her three children. In closing, she stated she was "truly sorry" for causing such pain, and that she was a different person now (at age 35) than she had been at age 15.

By decision dated that same day, the Board again denied the petitioner parole based on the seriousness of the crime and her minimization of her role in the crime.

## III

On or about November 30, 1999, the petitioner commenced this proceeding pursuant to CPLR article 78 challenging the Board's denial of parole. The proceeding was later effectively enlarged to encompass review of both the belated denial of parole following the de novo hearing of February 16, 1999, and the denial following the hearing of December 9, 1999. The petitioner argued that the facts of her case warranted her release on parole. The Board opposed the petition, arguing, *inter alia*, the fact that it gave greater weight to the seriousness of the petitioner's crime than it gave to her good institutional record did not render its decision irrational. Further, the fact that the petitioner obtained a certificate of earned eligibility did not compel her release.

In reply, the petitioner argued that Burnett received the maximum sentence of nine years to life because she was the more culpable for the victim's death. Nevertheless, the Board clearly viewed the petitioner as equally culpable and, in essence, had resentenced the petitioner on the facts it believed to be true.

By order entered May 31, 2000, the Supreme Court again granted the petition to the extent of directing the Board to hold a de novo hearing and issue a new determination. The Supreme Court, after reiterating its earlier findings, held that there was no support for the Board's conclusion that the petitioner lacked insight into her criminality, or that she was attempting to minimize her participation in the crime. Rather, the Supreme Court held, the petitioner had admitted her guilt and had clearly accepted her responsibility for the crime. Nevertheless, the Supreme Court opined, it appeared as if the Board's dissatisfaction stemmed from the petitioner's failure to confess to facts which conformed with the Board's account of the incident. Finally, the Supreme Court held that the Board had merely repeated findings previously found to be inade-

quate and a new hearing was required. Contrary to the conclusion reached by my colleagues in the majority, I agree with the Supreme Court's determination and thus I would affirm.

## IV

The majority has concluded that the Board's determination denying the petitioner parole is not so irrational as to border on impropriety. To this I ask: what more must an inmate do to earn parole? I certainly acknowledge that the legal showing required in such cases is a demanding one (*see, Matter of Russo v New York State Bd. of Parole,* 50 NY2d 69, 77; *Walker v Travis,* 252 AD2d 360), and parole decisions rest within the discretion of the Board and should not be lightly cast aside. However, given the lack of *any* evidence that the petitioner is at risk to commit further crimes, the Board's determination was completely and unmistakably irrational (*see, Matter of King v New York State Div. of Parole,* 190 AD2d 423, *affd* 83 NY2d 788).

The petitioner earned a certificate of relief from disabilities. Pursuant to Correction Law § 805, an inmate such as the petitioner *"shall* be granted parole release" at the end of her minimum period of incarceration "unless the board of parole determines that there is a reasonable probability that, if such inmate is released, [s]he will not live and remain at liberty without violating the law *and* that [her] release is not compatible with the welfare of society" (emphasis added). Successful completion of the required program and the award of a certificate create a presumption in favor of parole release (*see, People ex rel. Hunter v Bara,* 144 Misc 2d 750).

Correction Law § 805 was enacted as part of the 1987 Omnibus Prison Bill to address, *inter alia,* prison overcrowding (L 1987, ch 261; *see,* Pelgrin, Practice Commentaries, McKinney's Cons Laws of NY, Book 10B, Correction Law § 805, 2001 Pocket Part, at 280). Among the materials in the Bill Jacket relevant to this enactment, the State Division of Budget noted that the purpose of the bill was, *inter alia,* "[t]o enable the State to protect the public safety by combining the surety of imprisonment with opportunities for the *timely release of inmates who have demonstrated their readiness for return to society"* (1987 NY Senate-Assembly Bill S 6446, A 8538 [emphasis added]). Inmates who successfully complete work and treatment programs and who earn certificates of eligibility are presumed to be ready for release at the end of their minimum sentence. Moreover, only inmates serving sentences with a minimum term of no greater than six years are eligible. Thus, inmates serving longer minimum terms for more serious

felonies are not subject to release pursuant to Correction Law § 805. While release remains discretionary notwithstanding that an inmate has earned a certificate of eligibility (*see, Howard v New York State Bd. of Parole,* 270 AD2d 539; *Matter of Dorato v New York State Div. of Parole,* 264 AD2d 885), it warrants emphasis that the statute commands that an inmate who has earned a certificate of eligibility *"shall be granted parole release* at the expiration of [her] minimum term" unless the board of parole determines that it is reasonably probable that if such inmate is released "[s]he will not live and remain at liberty without violating the law *and* that [her] release is not compatible with the welfare of society" (Correction Law § 805 [emphasis added]).

There is not a shred of evidence in this record demonstrating that if released the petitioner poses a reasonable likelihood of a return to criminality or that releasing her would be inimical to the welfare of society. There was no credible evidence before the Board suggesting any likelihood that the petitioner will be unable to lead a law-abiding life; she apparently did so for more than 12 years prior to her arrest. Likewise, there was no evidence to support the conclusion that her release would be incompatible with the welfare of society. She poses no threat and has three children to care for. Her release would undeniably *further* the welfare of society by returning a loving mother to her family.

By repeatedly denying the petitioner's applications for parole, the Board has ignored its function. The factors to be considered by the Board are those enumerated in Executive Law § 259-i. Section 259-i (2) (c) (A), like Correction Law § 805, conditions release upon a reasoned assessment of whether there is a likelihood that if released, the inmate will return to a life of crime, or whether release is incompatible with the welfare of society (*see, Matter of King v New York State Div. of Parole,* 190 AD2d 423, *affd* 83 NY2d 788, *supra*). In making its determination, the Board must consider, *inter alia,* the inmate's institutional academic, vocational, and therapeutic achievements, and any disciplinary violations. The Board must also weigh an inmate's release plans including employment options, education, and training and support services available to the inmate upon release. While the Board is also to consider whether release will undermine respect for law in light of the seriousness of the crime, any such finding in that regard must of necessity be somewhat tempered when considering the application of an inmate who has received a certificate of earned eligibility and who is thus presumed to be ready for release in accordance with the Correction Law.

Clearly, in the instant matter, the crime of which the petitioner was convicted is very serious; it resulted in the death of a trusting and frail woman, and the petitioner ultimately admitted her full participation therein. However, the petitioner was convicted as a juvenile offender, and was sentenced to a term with a minimum of fewer than six years; she was eligible to earn a certificate of earned eligibility and she did so. Much like the situation condemned by the court in *Matter of King* (*supra*), it is not the responsibility of the Board to judge whether any convicted murderer should ever be eligible for parole. Rather, the issue before the Board was whether this inmate, the petitioner, Kim Thomas, notwithstanding her aberrational juvenile offender murder conviction, had demonstrated that, at the age of 35, she was not likely to return to a life of crime or that her release was otherwise incompatible with society's welfare. Given this appropriate decisional paradigm, I fail to see how any rational person could deny the petitioner's application on this record.

The petitioner was only 15 years old at the time of the crime and there is no evidence to rebut her version of the relevant events. Indeed, in affirming Burnett's conviction, this Court expressly held that it was Burnett who struck the victim and tied her up (*see, People v Burnett,* 205 AD2d 792, *supra*). The Board's obvious desire to elicit from the petitioner contrition of the same magnitude as it correctly would require from Burnett is without basis in fact. While both participants may be legally responsible for this felony murder (*see,* Penal Law § 125.25 [3]), the uncontroverted facts show that Burnett bore greater factual and moral culpability. The Board thus may not rationally punish the petitioner for failing to take what it arbitrarily considers to be adequate responsibility for her crimes.

In sum, on all of the facts presented, I conclude that the Board's determination that there was a reasonable probability that, if released, the petitioner would not live and remain at liberty without violating the law and that her release was not compatible with the welfare of society is totally without support in the record and, therefore, is irrational bordering on impropriety. Accordingly, I would remit this matter for yet another de novo hearing, at which the Board should avoid consideration of inappropriate factors (*see, Matter of King v New York State Div. of Parole,* 83 NY2d 788; *Matter of Quartararo v New York State Div. of Parole,* 224 AD2d 266), and instead determine, upon the true facts and upon application of the appropriate legal standards, whether the petitioner has earned her release on parole.