Peters, PJ.
(dissenting). Over 30 years ago, petitioner was sentenced to 18 years to life in prison for his role in the crimes that led to the death of an off duty police officer. He remains behind bars, having been denied parole seven times during that period, the most recent of which — decided by a two-to-one vote of the Board of Parole — -is now before us. The majority has concluded that the Board’s decision to deny parole to petitioner during this latest appearance did not exhibit “ ‘irrationality bordering on impropriety’ ” (Matter of Silmon v Travis, 95 NY2d 470, 476 [2000], quoting Matter of Russo v New York State Bd. of Parole, 50 NY2d 69, 77 [1980]). I respectfully disagree.
In my view, the Board’s decision was based upon significant errors of fact and the consideration of improper factors. As the parole hearing minutes reveal, the Board’s decision was made by the closest of margins (two commissioners voted to deny pa *1277 role and one dissented), such that any error should be considered relevant to the determination. In that regard, one of the commissioners who voted against petitioner’s release acknowledged that “anyone would be hard pressed to argue that [petitioner is] not . . . rehabilitated,” but professed his belief that petitioner’s achievements were contrasted by his “conduct in shooting this officer.” This commissioner further articulated his belief that petitioner might have been the one to pull the trigger by opining that it was “difficult for [him] to fathom how if the man with the gun is the one who’s right on top of this officer stealing his property, how [petitioner got] shot and [petitioner’s coconspirator did not] get shot.” Yet, petitioner was not the shooter. In fact, he was not even armed. The Assistant District Attorney who prosecuted petitioner wrote a letter in support of petitioner’s release in 2010, stating “with certainty that before the case went to the jury, I was convinced that [petitioner] was not the shooter. I am also certain that [Supreme Court] was convinced that he was not the shooter.” In a subsequent letter written in support of the instant parole application, he wrote that “there was not a scintilla of evidence that [petitioner] was the shooter” and that “no one involved in the investigation ever believed that [petitioner] was the shooter or that he was armed.” Indeed, during sentencing, Supreme Court stated that “[petitioner] stands before me having been found by the jury to have been a participant, but not the active prime mover. It is on that basis that he must be sentenced.” Petitioner, who had no prior criminal record and could have received consecutive sentences amounting to an aggregate prison sentence of 37V2 years to life, was sentenced to less than half of that.
This same commissioner also relied on his own subjective beliefs and experiences to interpret the facts in a manner contrary to the record by suggesting that petitioner was aware at the time of the incident that the victim was a police officer. Petitioner steadfastly maintained that he was unaware of such fact at any time during the course of events, and the record supports his assertion. Supreme Court described the victim as “a 55-year-old man . . . carrying a black gym bag[,] wearing a cap, corduroy pants and a coat,” and the prosecuting attorney wrote that the victim was “dressed in clothes that suggested he was a middle-aged manual laborer.” Yet this commissioner opined that, based upon his own training in the police academy, “when you’re pulling out your gun, the first words that are supposed to simultaneously come off your lips is ‘police.’ ” The emphasis that this commissioner placed on his belief that the victim must have identified himself as a police officer can only be viewed as relevant if it was also his belief that petitioner was the shooter; *1278 indeed, he stated that in his 20 years of experience in the system, “every single person who is charged with shooting an officer says [the victim] didn’t say who he was.”
Also troubling are repeated comments made by this same commissioner indicating that, because petitioner initially failed to cooperate with police in 1982 and neither of his two coconspirators were ever charged for their role in the offenses, petitioner put himself in the “precarious position” of being the only person who could be held accountable for the crimes. This commissioner implied that someone must continue to be punished for the unfortunate death of this police officer and, absent the ability to punish the most culpable party, petitioner must continue to pay that price in his stead. Manifestly, such punitive considerations find no support in statute (see Executive Law § 259-i) and have absolutely no relevance to the decision to grant or deny parole.[1] As the Board’s determination was tainted by these factual errors and improper considerations, it must be annulled (see Matter of King v New York State Div. of Parole, 83 NY2d 788, 791 [1994]; Matter of Prout v Dennison, 26 AD3d 540, 541 [2006]; Matter of Friedgood v New York State Bd. of Parole, 22 AD3d 950, 951 [2005]).
Even had such blatant factual errors and inappropriate considerations not affected the outcome, I would still find the Board’s decision to be irrational. To be sure, pursuant to the governing statute and early Court of Appeals precedent governing the review of parole decisions, the courts’ role appeared to be limited to discerning errors of fact or law (see Executive Law § 259-i [5]; Matter of Hines v State Bd. of Parole, 293 NY 254, 257 [1944]). However, more recent Court of Appeals jurisprudence, now well settled, propounds a more discerning standard *1279 under which such decisions should be reviewed for “irrationality bordering on impropriety” (Matter of Silmon v Travis, 95 NY2d at 476 [internal quotation marks and citation omitted]; see Matter of Partee v Evans, 117 AD3d 1258, 1259 [2014]). In my view, this language suggests that — more than simply ratifying a decision made by the Board so long as it adheres to the statutory mandates — the role of the courts is to make some measure of substantive evaluation to assure that justice is served. As the Court of Appeals taught in Silmon, “we review whether the Board’s decision to deny parole was arbitrary or capricious” (Matter of Silmon v Travis, 95 NY2d at 476).[2]
Applying this standard, I fully acknowledge that parole release is not granted merely as a reward for good conduct, and that the decision to grant or deny parole rests primarily within the discretion of the Board. I am also well aware that the showing required to set aside a parole decision is, indeed, a weighty one.[3] However, given the lack of any evidence to support the Board’s finding that there is a reasonable probability that petitioner would commit further crimes if released, and that his release would be incompatible with the welfare of society and undermine respect for the law, I find the Board’s determination to be patently irrational.
The majority rightly notes that petitioner’s achievements while incarcerated are truly remarkable and extraordinary, but in light of the task at hand, those accomplishments are worthy of iteration. Petitioner, who entered prison at the age of 20 with a high school diploma, has since earned both a Bachelor’s degree in organizational management and leadership skills and a Master’s degree in professional studies. Over the three decades of his incarceration, petitioner has assumed the role of adjunct instructor and academic assistant through Nyack College and the New York Theological Seminary, and has also become the facilitator or coordinator for at least eight distinct programs within his current and former correctional facilities. Throughout his incarceration, petitioner has successfully participated in nearly every rehabilitative program available to him, including several years of therapeutic counseling focused in part on taking responsibility for his crime, services to prepare him for his transition out of prison and programs addressing, among other areas, marriage, parenting and alternatives to violence. Through *1280 these efforts, petitioner has fully accepted responsibility for his actions and has repeatedly expressed sincere remorse for all of those affected by his crime, particularly the family of the victim. In a personal statement in his application for release to community supervision, petitioner stated that “[s]ince the pain I have caused . . . remains in my heart, my life and actions will always demonstrate atonement.” A practitioner who worked with petitioner stated that he “exemplifies the transformation toward responsibility, remorse, and making amends that we seek to achieve with all of our participants.”
In addition, petitioner has not only maintained employment during his incarceration, serving most recently as the Inmate Director of the Transitional Services Program in which he oversees 15 to 20 other inmates, but also continues to work extensively to promote the rehabilitation of other inmates. Petitioner worked to create the Stop the Violence Peace Initiative at Sing Sing Correctional Facility to address violence within the prison and helped to raise $10,000 for the prison’s Family Center, as well as for activities and school supplies for the children of inmates. He has established plans for employment outside of prison and successful integration back into the community in the form of letters of reasonable assurance from three organizations for employment and counseling, as well as close relationships with two established mentors. If released, petitioner would live with his wife, who he has known for more than 30 years, and enjoy the support of a large network of friends and family.
Petitioner’s behavioral record during his approximately 30 years of incarceration is extraordinary. He has incurred only one infraction ticket — and that almost a quarter century ago— for excess/altered clothing.[4] Moreover, according to both an independent psychological evaluation and his COMPAS Risk and Needs Assessment instrument, he is at the lowest possible risk level for reoffending. The author of the former evaluation stated that “[tjhere is nothing further [petitioner] could be expected to do while incarcerated that could lower his risk level.”
Over the years, petitioner has received an unprecedented outpouring of support and advocacy for his release by, among others, over 20 correction staff who supervise him on a daily basis, a former parole commissioner, the former Commissioner of Corrections and Community Supervision and the Assistant District Attorney who prosecuted his case. The Superintendent of Fishkill Correctional Facility, where petitioner is currently *1281 incarcerated, also wrote two letters in support of petitioner’s release, one stating that he “would be fine having [petitioner] and his family as [his] neighbors” and the other calling petitioner “the poster child for [the Department of Corrections and Community Supervision]” and its programs.[5] A retired parole commissioner who denied petitioner’s release in 2002 and 2006 wrote that he “strongly feel[s]” that petitioner “does [not] deserve to spend the remainder of his life incarcerated.” Hundreds of other inmates and members of petitioner’s community submitted letters of support or signed petitions in support of his release, prompting one commissioner to state, “I don’t think I’ve ever seen this many letters by correction officers in anyone’s file,” and another commissioner to remark that, as “one of the longest serving currently on the [B]oard . . ., [he had not] seen the amount of support that [petitioner has].”
Despite this abundance of evidence demonstrating petitioner’s extraordinary rehabilitative achievements that would appear to strongly militate in favor of granting parole, two commissioners declined to do so, seemingly on the sole basis that a police officer was killed during the course of an attempted robbery. As one of those commissioners frankly stated to petitioner during the hearing, “if you’re held, the reason you would be held is because a police officer was murdered in the line of duty.” “The Legislature, however, has not defined ‘seriousness of [the] crime’ in terms of specific categories of either crimes or victims” (Matter of King v New York State Div. of Parole, 190 AD2d 423, 433 [1993], affd 83 NY2d 788 [1994]). There can be no dispute that the crimes for which petitioner was convicted are serious and resulted in the tragic death of a police officer, but a blind eye cannot be turned to the facts underlying those offenses. Not insignificantly, petitioner was convicted of murder under the felony murder statute, requiring an intention on the part of petitioner to commit the underlying felony, but not requiring proof that he fired the weapon or had an intention to kill (see Penal Law § 125.25 [3]). Indeed, upon sentencing, Supreme Court noted that the evidence demonstrated that petitioner “did not go out into the street with the intention of committing murder.” Although “every murder conviction is inherently a matter of the utmost seriousness since it reflects the unjustifiable taking and tragic loss of a human life . . . , the Legislature has determined that a murder conviction per se should not preclude parole” (Matter of King v New York State Div. of Pa *1282 role, 190 AD2d at 433; see also Matter of Costello v New York State Bd. of Parole, 101 AD3d 1512, 1517 [2012, Spain, J., dissenting], revd on other grounds 23 NY3d 1002 [2014] [noting that “those who oppose petitioner’s parole release openly advocate the recurring position that an inmate convicted for the death of a law enforcement officer — even a nonshooter convicted of felony murder, as here — should never be released on parole. It bears emphasis that this was not and is not the law”]).
Upon considering all of the evidence, I am left with the inescapable conclusion that the Board’s decision to deny parole release to petitioner was irrational. Accordingly, I would reverse the judgment, annul the Board’s determination and remit the matter to the Board for further proceedings not inconsistent with this decision.

. To be clear, by no means am I suggesting that the consideration of petitioner’s conduct after arrest and prior to confinement are irrelevant; rather, I am asserting only that it was improper for the Board to attribute relevance to the fact that petitioner was the only culprit who could continue to be held accountable for the crime. In any event, the commissioner’s statement that it was petitioner’s “pattern of lies” and deceit that allowed the other perpetrators to escape prosecution, and which left petitioner in the “precarious position” of being the only one that could be held accountable for the crime, is contrary to the facts. The Assistant District Attorney who prosecuted petitioner unequivocally stated in his letter in support of petitioner’s release application that the police were already aware of the other perpetrators’ involvement in the crime, and that there was no other information petitioner could have provided that would have aided in the investigation and prosecution of those other individuals. In fact, noticeably absent from the record is any explanation as to why the other perpetrators were not prosecuted. Certainly, petitioner should not be penalized for law enforcement activities and/or decisions over which he had no control.

. I am not challenging the rationality standard governing our review of parole decisions, as the majority suggests. Rather, I take issue with the majority’s application of that standard to the facts of this case.

. Such awareness is evinced by this dissent — the first dissent that I have penned from a decision of the Board in my over two decades on this Court.

. It bears repeating that petitioner had never been convicted of a crime prior to that which resulted in his incarceration.

. Notably, Superintendent William J. Connolly shared that, in his 34 years in the corrections field, he authored only seven letters of this nature.